Affirmed and Memorandum Opinion
filed January 11, 2011.

 

In
The

Fourteenth
Court of Appeals



NO. 14-09-00919-CR



Selvin Canales
Chirinos, Appellant 

v.

The State of
Texas, Appellee 



On Appeal from
the 209th District Court

Harris County, Texas

Trial Court
Cause No. 1234856



 

MEMORANDUM OPINION 

Appellant Selvin Canales Chirinos challenges his
conviction for capital murder on the grounds that the evidence is legally and
factually insufficient and that the trial court reversibly erred by instructing
the jury on the law of transferred intent.  We affirm. 

BACKGROUND

On April 17, 2007, several individuals attempted to
hijack a silver[1]
Ford F-150 pick-up truck on Highway 59 North in Harris County.  The incident
began on the exit ramp for Bissonnet Street and culminated at the intersection
of the 59 North Service Road (the “Service Road”) and Bissonnet.  Several
people witnessed the incident both on and off the freeway.  The incident
involved three pick-up trucks:  the silver Ford, a white Chevy, and a green
Chevy.  After numerous shots were fired, two individuals were found dead, one in
the Bissonnet intersection and another in the back of the abandoned silver Ford
parked in a nearby strip mall.  

During their investigation, Houston Police Department
(“HPD”) officers quickly identified appellant as a suspect and brought him in
for questioning.  Appellant voluntarily made two video-taped statements.  In
the first, he denied his involvement in the attempted hijacking, explaining
that he was shot in the arm as an innocent bystander.  After watching the
red-light camera video, however, he made another statement in which he admitted
his involvement in the incident.  Appellant provided the following information
in his second statement.  He explained that on April 16, two individuals he
identified only as “Brujo” and “the Cousin” offered him $500 to help “steal” a
“load of wetbacks.”  Appellant then called an individual he identified only as
“Gustavo” to help.  The plan involved using two trucks to get in front of and
behind the silver Ford, which the cousin and Brujo knew was carrying illegal
aliens.  They also knew the silver Ford would be exiting 59 North at Bissonnet,
and they planned to trap it and “intimidate” the driver into giving up his load
of illegal aliens.  Brujo and the Cousin told appellant that the illegal aliens
would not have weapons but that Brujo and the Cousin would be carrying guns.

On the day of the incident, Gustavo was driving
appellant’s white Chevy truck with appellant as the passenger.  They drove
behind the silver Ford as it exited Highway 59 at Bissonnet.  Brujo and the Cousin
were driving the green Chevy, which pulled in front of the silver Ford truck on
the Bissonnet exit ramp.  The green Chevy stopped, forcing the silver Ford to
stop behind it.  The Cousin got out of the passenger side of the green Chevy,
and appellant got out of the white Chevy.  They both approached the silver
Ford; the Cousin was armed, but appellant claimed that he was not.  As
appellant approached the driver’s side of the silver Ford, someone in the
backseat shot at him through the window of the truck.  As appellant ran back to
his truck, he heard several shots fired.  

The green Chevy and the silver Ford exited onto the Service
Road and were involved in an accident at the light at Bissonnet.  When Gustavo
and appellant arrived at the light at Bissonnet, appellant saw that there had
been an accident at the intersection.  He also saw shooting between the green
and silver trucks.  Appellant stated that the green Chevy “took off” through
the intersection to the left, and the silver Ford was driven down the Service
Road until it turned into a parking lot.  Gustavo drove appellant’s truck down
the road behind the silver Ford and took appellant to the hospital.  Appellant expressed
the Cousin’s threat that if anything went wrong, “they” would kill the person
who talked.

Appellant was indicted and tried for the capital
murder of the decedent found at the scene, Moises Mejia.  Specifically, he was
charged with “unlawfully, while in the course of committing and attempting to
commit the kidnapping of Moises Mejia, intentionally caus[ing] the death of
Moises Mejia by shooting Moises Mejia with a deadly weapon, namely, a firearm.” 


Appellant’s statement was admitted at his trial, together
with the red-light camera video, various crime-scene photos, bullets and
fragments, and the autopsy reports from both decedents, among other things.

The red-light camera video showed a silver pick-up truck
running the red light on the Service Road at Bissonnet, hitting a brown sedan
on Bissonnet in the intersection, then coming to a stop.  Several individuals
jumped out of the back and the cab of the silver truck and ran away.  A white
pick-up truck drove up on the driver’s side of the silver truck, and a green
pick-up truck pulled in behind the silver truck.  The actions between the white
pickup and the silver truck’s driver’s side are hidden from the angle of the
camera by the body of the silver truck.  Several small explosions appeared in
the front windshield of the green truck.  An individual exited the passenger
side of the green truck and approached the silver truck, only to quickly return
to the green truck.  The silver truck drove away from the scene and continued straight
on the Service Road.  The white truck, fully visible at this point, appeared to
have the front driver’s door open.  Both it and the green truck followed
shortly after the silver truck; the green truck ran over something in the road
as it left the scene.  The entire incident at the intersection took less than a
minute to unfold.  Once several cars cleared the intersection, the video showed
what appeared to be a person lying on the street in the intersection of Bissonnet
and the Service Road.

Numerous witnesses testified, including several
police investigators and analysts, an individual who saw the incident beginning
on 59 North, and two individuals who observed what occurred at the intersection
of Bissonnet and the Service Road.  The witness who saw the incident from
Highway 59 explained that he was caught in slow-moving traffic.  He was in the
lane next to the Bissonnet exit and saw, through his passenger window, two
Hispanic-looking individuals approaching a silver Ford pick-up truck with guns
drawn.  These two individuals approached the silver Ford from behind and began
shooting into the back window of the silver truck.  He testified that the
silver Ford drove down the exit ramp, while he continued on 59 North to the
next exit, Gessner Street, and turned around to come back to the scene.  He
stated that he called 911 to report the incident and that he saw a green Chevy
pick-up truck with bullet holes through the windshield at Gessner in the U-turn
lane.  Finally, he explained that because everything occurred so quickly, he
was unable to identify the individuals who were shooting at the silver truck.

Two other witnesses described the scene at the Bissonnet
intersection.  One witness testified that she was pushing her bicycle across
the intersection on Bissonnet when she heard a car crash.  When she turned to
look, she saw several people running out of a silver truck.  She saw another
truck pull up behind the silver truck and saw gunfire coming from that truck,
which she testified was green.  She testified that she saw “[a]t least three
guys” running from the silver truck and that “[t]he fourth one was the one that
got injured.”  According to this witness, when the green truck drove away, it
ran over the decedent lying in the street.  She stated that she never saw any
gunfire coming from the silver truck.

The other witness explained that he was at the stop
light on Bissonnet at the intersection with the Service Road when he saw a
silver truck run into a car in the intersection.  He watched an individual run
out of the silver truck toward a corner gas station; he then turned back and
saw that a dark green truck had pulled closely behind the silver truck.  He testified
that it appeared to him that people were shooting from inside the green pick-up
truck through the window at the other truck.  He stated that he did not see
anyone from the silver truck shooting.  He, like the other eyewitness,
testified that the green truck drove over the decedent lying in the street at
the scene.  Finally, when asked whether he saw where the decedent came from, he
stated, “I’m not certain, but it appeared to me that that person came from the
first truck that came into the intersection.”

The HPD Crime Scene investigator who examined the three
vehicles involved in the incident testified that she discovered approximately
eighteen gunshots directed at the silver Ford truck.  The majority of these
gunshots were directed at the driver’s side and the rear tailgate area of the
vehicle.  The evidence suggested that no one was shooting from inside the
silver truck.  She examined the green Chevy truck and noted that the front
windshield appeared to have been replaced recently.  She testified that there
was no evidence of gunshots entering this vehicle; instead, there was evidence
of gunshots exiting the vehicle.  Regarding the white Chevy truck, this witness
testified that she discovered a bullet lodged inside the door, but this bullet
did not enter the cab of the vehicle.  Finally, she and another crime scene
investigator recovered several finger and palm prints from inside the vehicles,
but the HPD latent print examiner was unable to identify any of these prints as
belonging either to appellant or anyone else.

A firearm examiner from the HPD crime laboratory
firearms section testified regarding the bullets and fragments that the crime
scene investigators had recovered from the vehicles and the scenes both on the Bissonnet
exit ramp and at the intersection where the incident culminated in the
decedent’s death.  He explained that he identified shell casings from a 9-mm
Luger and two separate .45-mm automatic firearms.  According to this expert, at
least three, and possibly four, guns were used in the shootout.  The decedent
found in the back of the silver truck was killed by one of the .45 firearms,
while the decedent found in the intersection was killed by a different .45
firearm.  He further testified that the identifiable bullets and fragments
recovered from the silver truck were shot from one of the .45 firearms and the
9-mm Luger firearm.  

Additional witnesses testified: the on-scene HPD
crime scene investigator, the HPD homicide detective in charge of this case,
the HPD homicide officer who took appellant’s statement, the individual who
rented the silver truck, and the two Harris County medical examiners who
performed the autopsies on the two decedents.  After hearing the testimony and
argument of counsel, the jury found appellant guilty of capital murder as
charged in the indictment.  The trial court sentenced appellant to life in
prison.  This appeal timely followed.

ANALYSIS

A.        Sufficiency of
the Evidence

In his first two issues, appellant argues the
evidence is legally and factually insufficient to support his conviction.  While
this appeal was pending, the Court of Criminal Appeals held that only the legal
sufficiency standard should be used to evaluate the sufficiency of the evidence
in a criminal case.  Brooks v. State, 323 S.W.3d 893, 894–95 (Tex. Crim.
App. 2010) (plurality opinion); id. at 926 (Cochran, J., concurring).  Accordingly,
we review the sufficiency of the evidence in this case under a rigorous and
proper application of the Jackson v. Virginia[2] legal
sufficiency standard.  Brooks, 323 S.W.3d at 906.

In a legal sufficiency review, we view all the
evidence in the light most favorable to the verdict and determine whether a
rational fact-finder could have found the defendant guilty of all the elements
of the offense beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S.
307, 319 (1979); Williams v. State, 270 S.W.3d 140, 142 (Tex. Crim. App.
2008).  We must give deference to the responsibility of the trier of fact to
fairly resolve conflicts in testimony, to weigh the evidence, and to draw
reasonable inferences from basic facts to ultimate facts.  Hooper v. State,
214 S.W.3d 9, 13 (Tex. Crim. App. 2007).  Thus, we defer to the fact finder’s
resolution of conflicting evidence unless the resolution is not rational.  See
Brooks, 323 S.W.3d at 906–07.  

Here, appellant admits that he “and his crew”
attempted to intercept a vehicle manned by “coyotes (human traffickers) who
were transporting a dozen or so illegal aliens through Houston on a busy
freeway in broad daylight.”  He further acknowledges that the evidence is
sufficient to establish that he is guilty of the murder of Mejia, either as the
primary actor or as a party.  However, he asserts that there is no evidence of his
kidnapping or attempting to kidnap Mejia.  We thus confine our review to
whether there was legally sufficient evidence to establish that appellant,
either as a principal or a party, was in the course of kidnapping or attempting
to kidnap Mejia when Mejia was murdered.  Appellant’s argument hinges on his claim
that “it is unknown whether [Mejia] was one of the illegal aliens targeted by
appellant, one of the coyotes, or just an innocent bystander.”  

A person commits the offense of kidnapping if he
intentionally or knowingly abducts another person.  Tex. Penal Code Ann. §
20.03(a) (West 2003).  A person attempts to commit kidnapping if he
specifically intends to kidnap a person and performs an act amounting to more
than mere preparation that tends but fails to effect the commission of the
intended kidnapping.  See id. § 15.01(a) (West 2003) (defining “criminal
attempt”).  “Abduct” means restraining another person with intent to prevent
his liberation by, among other things, using or threatening to use deadly
force.  Id. § 20.01(2) (West Supp. 2009).  “Restrain” means restricting
a person’s movements without consent to substantially interfere with the
person’s liberty by moving the person from one place to another or by confining
the person.  Id. § 20.01(1).  Restraint is without consent if it is
accomplished, as is relevant here, by force or intimidation.  Id.  There
is no specific time requirement for determining whether a person has been restrained. 
Hines v. State, 75 S.W.3d 444, 447–48 (Tex. Crim. App. 2002).  “It is up
to the jury to distinguish between those situations in which a substantial
interference with the victim’s liberty has taken place and those situations in
which a slight interference has taken place.”  Id. at 448.  

The red-light camera video clearly shows that Mejia
was not an “innocent bystander.”  The intersection was very active with many
cars driving through it; no one was standing in the middle of the busy
intersection when this incident occurred.  In fact, based on the video, the
only place Mejia possibly could have come from is either the silver or the
white truck.  Because appellant stated that he and his friend Gustavo were the
only people in the white truck, the jury may have rationally inferred that the
decedent had to have been in the silver truck.  See Brooks, 323 S.W.3d
at 906–07.  Thus, the jury reasonably could have determined that Mejia was
one of the illegal aliens appellant and his crew were attempting to “steal,” i.e.,
kidnap, or one of the human traffickers.  

Viewed in the light favorable to the verdict, the
evidence shows that appellant and his cohort, both armed with guns, approached
the vehicle in which the decedent was riding after it had been forcibly stopped
on the Bissonnet exit ramp of Highway 59 North.  The silver truck managed to
escape from appellant and his crew, only to be again trapped and shot at by them
in the intersection of the Service Road and Bissonnet.  Whether the decedent
was one of the traffickers or one of the illegal aliens, a rational juror,
based on this evidence, could have determined that appellant, as a principal or
party, was attempting to or was substantially interfering with the decedent’s
liberty when he was murdered.  See id.; see also Hines, 75 S.W.3d
at 447–48.  We thus conclude that there is sufficient evidence to
support the jury’s verdict that appellant, as a principal or party, murdered
the decedent while in the course of kidnapping or attempting to kidnap him.[3]  We
overrule appellant’s issues challenging the sufficiency of the evidence.

B.        Charge
Error

In his third issue, appellant argues that the trial
court reversibly erred in instructing the jury on the law of transferred
intent.  Appellant specifically argues that (a) transferred intent was not
raised by the evidence because there was no evidence or testimony that the
shooter intended to kill anyone other than the decedent and (b) the
transferred-intent application paragraph omitted a key element—that Mejia was
the intended kidnap victim.  A claim of jury-charge error is governed by the
procedures set forth in Almanza v. State, 686 S.W.2d 157, 171 (Tex.
Crim. App. 1985).  We must first determine whether the trial court erred in its
submission of the charge.  Barrios v. State, 283 S.W.3d 348, 350 (Tex.
Crim. App. 2009).  If error exists and appellant properly objected at trial,
reversal is required if “some harm” resulted, i.e., if the error was
“calculated to injure the rights of the defendant.”  Id. (quoting Almanza,
686 S.W.2d at 171).  If appellant failed to object, error must be “fundamental,”
and reversal will result only if the error was so egregious and created such
harm that the defendant “has not had a fair and impartial trial.”  Id.
(quoting Almanza, 686 S.W.2d at 171).

Here, the trial court provided the following
transferred-intent instruction and application paragraph in its charge to the
jury:

A person is nevertheless
criminally responsible for causing a result if the only difference between what
actually occurred and what he desired, contemplated, or risked is that:

(1)  A different offense was
committed; or

(1)  [sic] A different person or
property was injured, harmed, or otherwise affected.

Now, if you believe from the
evidence beyond a reasonable doubt that . . . [appellant] acting alone or with
Brujo and/or Primo also known as Cousin and/or Gustavo and/or an unknown person
as a party to the offense . . . did then and there, while
in the course of committing or attempting to commit the offense of kidnapping,
unlawfully and intentionally shoot a firearm at Salvador Ayala and/or Victor
Gonzales and/or Jose Guidos and/or an unknown person, intending that death
would occur to Salvador Ayala and/or Victor Gonzalez and/or Jose Guidos and/or
an unknown person, but instead missed Salvador Ayala and/or Victor Gonzalez
and/or Jose Guidos and/or an unknown person and hit Moises Mejia, causing the
death of Moises Mejia with the use of a deadly weapon, namely a firearm, then
you will find the defendant guilty of capital murder, as charged in the
indictment.

On appeal, appellant asserts that there was no evidence
that anyone other than Mejia was the target of the shooter.  He points to
testimony from one of the investigating officers who stated that Mejia was shot
in the head from around thirty feet away.  Thus, appellant contends, it was
evident that Mejia was the target of the shooter, and the transferred intent
instruction was erroneous.  We disagree.  As described above, this incident
occurred quickly, with multiple gunshots fired in a short amount of time.  No
one was able to determine who shot Mejia.  Further, based on the evidence and
testimony, it is unclear which individual was the target of the gunfire; it is
clear only that the shots were intentionally fired at the occupants of the
silver truck.  

Because any of the occupants of the vehicle could
have been the intended victim of this offense, the trial court properly
instructed the jury on the law of transferred intent.  See Tex. Penal
Code Ann. § 6.04(b)(2) (West 2009) (defining law of transferred intent as
injury, harm, or other effect to a different person or property); see also
Sholars v. State, 312 S.W.3d 694, 703–04 (Tex. App.—Houston [1st Dist.]
2009, pet. ref’d) (applying law of transferred intent in a capital murder
case).  Further, the application paragraph required that the shooter specifically
intended to kill one of the named individuals; thus the jury was not authorized
to convict appellant unless it found that appellant, as a principal or party,
specifically intended to kill one of the occupants of the silver truck.[4]  We thus
overrule the first portion of this issue relating to whether the trial court
erred in including the law of transferred intent in the jury charge.

Appellant next asserts that the application paragraph
erroneously omits the required element that the decedent, Mejia, was the
intended kidnap victim.  However, as noted above, capital murder as charged
here does not require that the intended victim of the kidnapping or attempted
kidnapping be the same person who was murdered.  See Tex. Penal Code Ann.
§ 19.03(a)(2) (West Supp. 2009).  Further, because the name of the victim is
not an element of kidnapping,[5]
the absence of the victim’s name in the jury charge was not error.  Cf.
Fuller v. State, 73 S.W.3d 250, 250–51 (Tex. Crim. App. 2002) (noting that
offense of injury to an elderly person does not include the victim’s name as a
substantive element of the offense).  

Finally, we note that appellant did not object to the
court’s charge on this basis.  Accordingly, we would reverse only if the error
was so egregious and created such harm that the defendant “has not had a fair
and impartial trial.”  Barrios, 283 S.W.3d at 350.  As discussed above,
the State presented substantial evidence of this offense, including a live
video that captured the events surrounding the murder.  Additionally, appellant
admitted his involvement with the scheme to kidnap the individuals in the
silver truck and confessed his awareness that firearms would be used in the
commission of the offense.  After examining the entire record, even if omitting
Mejia’s name from this portion of the jury charge were error, we simply cannot
say that it rose to the level of preventing the defendant from having a fair
and impartial trial.  We thus overrule appellant’s third issue.

For the foregoing reasons, we affirm the trial
court’s judgment. 

                                                                                    

                                                                        /s/        Adele
Hedges

                                                                                    Chief
Justice

 

Panel consists of Chief Justice Hedges
and Justice Jamison and Senior Justice Mirabal.*

Do
Not Publish — Tex. R. App. P. 47.2(b).









[1]
This vehicle was described as either silver or gray by various witnesses.  For
the sake of clarity, we refer to it throughout this opinion as silver.





[2]
443 U.S. 307, 319 (1979).





[3]
Moreover, to commit capital murder as is alleged here, the defendant need only
commit murder in the course of kidnapping or attempted kidnapping.  See
Tex. Penal Code Ann. § 19.03(a)(2).  Nothing in the statute requires that the
intended victim of the kidnapping or attempted kidnapping must also be the
murder victim.  





[4]
See Tex. Penal Code Ann. § 19.03(a)(2) (requiring that the defendant
intentionally commit murder in the course of committing or attempting to
commit, as is relevant here, kidnapping).  





[5]
See id. § 20.03(a).  





* Senior Justice Margaret Garner Mirabal
sitting by assignment.